IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MAYBELLINE FARMER,

               Plaintiff,                       CV-04-1684-ST

      v.                                   FINDINGS AND
                                         RECOMMENDATION

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

               Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Maybelline Farmer ("Farmer"), brings this action pursuant to 42 USC §§ 405(g)

and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social

Security denying her application for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act and Supplemental Security Income ("SSI") disability benefits under Title

XVI of the Social Security Act. For the reasons that follow, the Commissioner's denial should

be reversed, and this case should be remanded for further administrative proceedings.

///

1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Born in 1955, Farmer was 47 years old at the time of the hearing. Tr. 59.[1]  A high school

graduate, she completed one and a half years of college.  Tr. 75.  Farmer protectively filed

applications for DIB and SSI in March 2002, alleging disability beginning June 1, 1999, due to

back pain, shoulder pain, neck pain, migraines and sleeplessness.  Tr. 69.  For purposes of DIB

eligibility only, Farmer's date last insured is September 30, 2001.  Tr. 62.  Both applications

were denied initially and on reconsideration.  Tr. 35-39, 43-45, 217-21, 223-25.   Farmer

requested a hearing, which was held on April 17, 2003, before Administrative Law Judge

("ALJ") Joseph D. Schloss.  Tr. 234-65.  On June 16, 2003, the ALJ issued a decision finding

Farmer not disabled within the meaning of the Social Security Act.  Tr. 18-30.  That decision

became the final decision of the Commissioner on October 27, 2004, when the Appeals Council

denied Farmer's request for review.  Tr. 5-9.  Farmer now seeks judicial review of the

Commissioner's decision.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act.  20 CFR §§ 404.1520, 416.920.[2]  Below is a summary of

the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir

1999):

---

[1]  Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 8).

[2]  Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12 months[.]"  42 USC § 423(d)(1)(A).

2 - FINDINGS AND RECOMMENDATION

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity.  If so, the claimant is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under step two.  20 CFR §§ 404.1520(b), 416.920(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  If not, the claimant is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 CFR §§ 404.1520(c), 416.920(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  If so, the claimant is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under step four.  20 CFR §§ 404.1520(d),  416.920(d).

If the adjudication proceeds beyond Step Three, the Commissioner must assess the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments.  20 CFR §§ 404.1545(a), 416.920(e), 416.945; Social Security Ruling ("SSR") 96-8p.

Step Four.  The Commissioner determines whether the claimant is able perform work he or she has done in the past.  If so, the claimant is not disabled.  If the claimant demonstrates he or

3 - FINDINGS AND RECOMMENDATION

she cannot perform work done in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 CFR §§ 404.1520(e), 416.920(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  If not, the claimant is disabled.  If the Commissioner finds the claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can do, then the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 CFR §§ 404.1520(f), 404.1566, 416.920(f).

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at 1098.  At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  *Id.*

## THE ALJ'S FINDINGS

At step one, the ALJ found that Farmer had not engaged in substantial gainful activity since the alleged disability onset date.  Tr. 28.

At step two, the ALJ found that Farmer suffered from the following severe impairments: cervical and lumbar degenerative disc disease, left shoulder costochondritis, and a depressive disorder.  Tr. 29.

At step three, the ALJ found that Farmer's impairments did not meet or equal the requirements of a listed impairment.  *Id.*  The ALJ determined that Farmer had the RFC to:

4 - FINDINGS AND RECOMMENDATION

lift and carry up to 20 pounds on occasion and frequently up to 10 pounds. She can sit, stand, or walk 6 hours each in an 8-hour workday, and needs an option to alternate her positions. She is limited to only occasional overhead reaching with her left upper extremity. She has moderate limitations in understanding, remembering and carrying out detailed instructions, and a moderate limitation in interaction with the general public.

*Id.*

At step four, the ALJ found that Farmer was not able to perform her past relevant work.

*Id.*

At step five, the ALJ found that, based on the RFC and on the VE's testimony, Farmer could perform work existing in significant numbers in the national economy. Tr. 29.

## **STANDARD OF REVIEW**

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citations omitted). The Commissioner bears the burden of developing the record, even when the claimant is represented by counsel. *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991), citing *Brown v. Heckler*, 713 F2d 441, 443 (9th Cir 1983). This is because "[d]isability hearings are not adversarial in nature. *DeLorme*, 924 F2d at 849 (citation omitted).

District courts have the power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the case. 42 USC § 405(g). The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of

the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000).  The

issue turns on the utility of further proceedings.  *Id*.

      The Commissioner's decision must be affirmed if it is based on proper legal standards

and the findings are supported by substantial evidence in the record as a whole.  42 USC §

405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence

means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Andrews*, 53 F3d at 1039.

The court must weigh all of the evidence, whether it supports or detracts from the

Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations

omitted).  The Commissioner's decision must be upheld, however, even if "the evidence is

susceptible to more than one rational interpretation."  *Andrews*, 53 F3d at 1039-40.

## <u>DISCUSSION</u>

      Farmer alleges that the ALJ erred by: (1) failing to give controlling weight to a treating

doctor's opinion; (2) failing to obtain an updated medical opinion based upon receiving

additional medical evidence regarding a newly diagnosed mental impairment; (3) offering

insufficient reasons for disregarding her testimony; (4) finding her condition of chronic

hiccups/belching was not severe; and (5) asking a deficient vocational hypothetical question to

the VE.

      For the reasons that follow, this court remands this case for further administrative

proceedings.

///

///

6 - FINDINGS AND RECOMMENDATION

I.    **Treating Doctor's Opinion**

According to Farmer, the ALJ erred in failing to give controlling weight to the opinion of Farmer's treating physician, Toni Hero, DO.  Dr. Hero opined that Farmer met the Listing for Somatoform Disorders, 20 CFR Pt. 4, Subt. P, Appx. 1, 12.07(A)(2)(e).  Tr. 211-12.  Farmer contends the ALJ was legally obligated to give Dr. Hero's opinion controlling weight because it is supported by the record and was not contradicted by any other physician.

A.    **Legal Standard**

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1195 (9th Cir 1999) (citation omitted). The relative weight afforded the opinion of a physician depends upon his or her opportunity to observe and to get to know the patient as an individual.  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1996).  Generally, a treating physician's opinion is afforded the greatest weight in disability cases because "the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual."  *Ramirez v. Shalala*, 8 F3d 1449, 1453 (9th Cir 1993) (citations omitted).

A treating physician's opinion is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other evidence of record.  20 CFR §§ 404.1527(d)(2), 416.927(d)(2).  However, a treating doctor's uncontroverted opinion on issues that are reserved to the Commissioner is not controlling, nor is it given any special significance.  20 CFR §§ 404.1527(e), 416.927(e); *see also* SSR 96-5P, 1996 WL 374183, *1-2.  Among the issues reserved to the Commissioner are whether an individual's impairment meets or is equivalent in severity to the requirements of any

7 - FINDINGS AND RECOMMENDATION

impairment in the listings, the individual's RFC, whether the individual's RFC prevents the performance of past relevant work, and whether an individual is "disabled" under the Social Security Act.  SSR 96-5P, 1996 WL 374183, *2.

An uncontradicted treating doctor opinion may only be discredited for "clear and convincing reasons."  *Thomas v. Barnhart*, 278 F3d 947, 956-57 (9th Cir 2002) (citation omitted). Where the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Lester*, 81 F3d at 830 (citation omitted).

## B.      Dr. Hero's Opinion

Dr. Hero, a practitioner with the Family Care Clinic, has been involved in Farmer's care since at least March 2002, when she was the physician designated to receive Farmer's test results from Quest Diagnostics.  Tr. 144.[3]  Although Dr. Hero did not see Farmer during her visits on October 4, December 4 and December 18, 2002, as well as on January 24, 2003, she reviewed and approved the resident's notes on each occasion.  Tr. 191, 193, 197, 198.  Dr. Hero saw Farmer on January 31, 2003.  Tr. 190.  She also ordered lab tests done on December 18, 2002. Tr. 187.

Before the April 17, 2003 administrative hearing, Farmer's counsel telephoned Dr. Hero and then sent her a check-the-box form with room for comments, inquiring about Farmer's medical condition.  Tr. 210-12.  Dr. Hero completed and signed the form on April 16, 2003.  She

---

[3] Medical records from Family Care Clinic, where Farmer was a patient starting in June 2001, mostly consist of handwritten notes which are often illegible.  The 2001 to April 2002 reports do not contain the name of the treating physician. Reports from May 2002 to July 2002 do not have Dr. Hero's name or signature on them.

8 - FINDINGS AND RECOMMENDATION

confirmed that Farmer had been diagnosed with depression, anxiety, chronic hiccups, GERD,[4] mild herniated discs at C4-5 and C5-6, chronic low back pain, spasms and obesity.  Tr. 210.  She also confirmed that Farmer continues to suffer from insomnia, and tends to isolate herself and have difficulty leaving her house due to increased symptoms of anxiety.  Tr. 211.  Dr. Hero believed these problems to be longstanding and to have first occurred prior to June 30, 2001, with the exception of chronic hiccups, which started in April 2002.  *Id.*

The form asked whether the Listing for Somatoform Disorders applied to Farmer. Somatoform disorders are "physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."  20 CFR Pt. 4, Subt. P, Appx. 1, 12.07(A)(2)(e). The necessary level of severity for these disorders is met when the requirements in both A and B are satisfied.[5]  Dr. Hero found that Farmer satisfied the requirements in parts A and B. Tr. 211-12.  Specifically, she circled option (2)(e) in part A, which is medically documented evidence of "[p]ersistent nonorganic disturbance of . . . [m]ovement and its control (e.g.,

---

[4]  GERD is gastroesophageal reflux disease.

[5]  A. Medically documented by evidence of one of the following:
    1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
    2. Persistent nonorganic disturbance of one of the following:
        a. Vision; or
        b. Speech; or
        c. Hearing; or
        d. Use of a limb; or
        e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or
        f. Sensation (e.g., diminished or heightened).
    3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;
And
B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

9 - FINDINGS AND RECOMMENDATION

coordination disturbance, psychogenic seizures, akinesia, dyskinesia."  Tr. 211.  For part B, Dr.

Hero circled options (2) (resulting in "marked difficulties in maintaining social functioning") and

(3) (resulting in "marked difficulties in maintaining concentration, persistence, or pace").

Tr. 212.  She made no additional comments.

C.    **Analysis**

The ALJ rejected Dr. Hero's assessment as not convincing because: (1) it was prepared

on a simple check-the-box form and did not contain references to particular clinical or

examination findings, or specific limitations; (2) the diagnosis of somatoform disorder appears

nowhere else in the record; and (3) no other source has reported that Farmer's hiccups are

disabling.  Tr. 25.

Farmer alleges the ALJ has failed to offer clear and convincing reasons for rejecting

Dr. Hero's opinion.  In response, the Commissioner defends the validity of the ALJ's reasons,

and raises another basis for rejecting Dr. Hero's opinion, namely disputing Dr. Hero's status as a

treating physician.  Because the ALJ did not address this last issue in his decision, it cannot be

raised for the first time on appeal.  *See SEC v. Chenery Corp.*, 332 US 194, 196 (1947) ("a

reviewing court, in dealing with a determination or judgment which an administrative agency

alone is authorized to make, must judge the propriety of such action solely by the grounds

invoked by the agency").  Furthermore, because Dr. Hero participated in Farmer's medical care

for at least one year from March 2002 until April 2003, she qualifies as a treating physician.

1.    **Check-The-Box Form**

Ninth Circuit case law disfavors the so-called "fill in the blank documentation" and

"check off reports."  *See Murray v. Heckler*, 722 F2d 499, 501 (9th Cir 1983) (finding the

Secretary erroneously relied on a diagnosis consisting of check marks in boxes on a form supplied to a non-treating physician by the Secretary, which was contradicted by the claimant's doctors); *see also Young v. Heckler*, 803 F2d 963, 967-68 (9th Cir 1986).

Cases disfavoring check-the-box medical opinions rely instead on detailed and thorough medical reports which contradict the check-the-box opinions. In *Murray*, the court rejected a non-treating physician's check-the-box form, which contained similar findings but a diagnosis in sharp contrast to the opinions of the claimant's three treating doctors. In *Young*, the court upheld the ALJ's decision to discount a treating doctor's check-the-box opinion because it was contradicted by the same physician's earlier opinion and by the opinions of all the examining physicians, who had reached similar diagnoses but with opposite functional limitations. Also the treating physician's check-the-form box included unexplainable inconsistencies; he concluded both that the claimant would be disabled for an indefinite period and that the claimant's disability would end in six months and the condition had "improved." *Young*, 803 F2d at 967-68.

By contrast, Dr. Hero's check-the-box form contains no inconsistent information. She did not contradict her earlier conclusions, and no medical opinions by treating or examining physicians reach opposite diagnoses. Therefore, the inquiry cannot end by simply dismissing Dr. Hero's opinion because it is a disfavored check-the-box form.

A treating doctor's opinion generally is controlling if it is well-supported by medically acceptable evidence and not otherwise contradicted by the record. In this case, Dr. Hero's opinion that Farmer meets the Listing for Somatoform Disorders is not entitled to controlling weight, as that is an issue reserved to the Commissioner. However, the Commissioner may not

ignore Dr. Hero's opinion and is required to "evaluate all the evidence in the record to determine the extent to which the opinion is supported by the record."  SSR 96-5P, 1996 WL 374183, *3. A review of the record corroborates Dr. Hero's opinion that her chronic hiccups/belching constitutes a somatoform disorder by causing her significant pain and embarrassment.

> **a.**      **Medical Documentation of Non-Organic Disturbance of Movement and its Control**

With regard to part A of the Listing for Somatoform Disorders, the record documents that Farmer was diagnosed and treated for chronic and acute hiccups and belching.  These conditions qualify as disturbances of movement and its control.  Nothing in the medical record indicates that the cause of the hiccups and belching is non-organic, but doctors did attempt to determine the cause.

Farmer began receiving health care at the Family Care Services in June 2001.  Tr. 71.  On October 1, 2001, she was prescribed Prevacid for GERD.  Tr. 135.   The first reference to hiccups in the medical record appears in progress notes dated April 17, 2002, when Farmer told her doctor that she had been experiencing one to two weeks of hiccuping, and that the hiccups occurred one to two times a month and lasted for days.  Tr. 133.  On May 8, 2002, Farmer complained of epigastric pain and belching indigestion.  Tr. 206.  An unidentified doctor noted under "Assessment and Plan" that Farmer suffered from mild to moderate epigastric pain, and probable recurrent PUD/GERD.[6]  *Id.*  On June 7, 2002, Farmer saw Beth Thompson, FNP, whose notes do not mention hiccuping or belching.  Tr. 204-05.  On July 18, 2002, examining physician David Morell, MD, noted under "Review of Systems" that Farmer had chronic hiccups and burping.  Tr. 157.

---

[6]  PUD is peptic ulcer disease.

On July 20, 2002, Farmer did not complain of hiccups, but described feeling chest pain which had lasted on and off for six months, as well as 30-minute episodes of "fluttering heart" on and off.  Tr. 202.  She mentioned symptoms of chest pain and fluttering heart on July 29, 2002, when she was again seen by nurse practitioner Thompson.  Tr. 201.  She also told Thompson that "she had discussed this previously with physicians and has been diagnosed with GERD."  *Id.*

On September 17, 2002, Farmer was seen by another unidentified Family Services Care physician, who completed an annual exam form and noted that the patient has chronic hiccups which have lasted for 18 months[7] and that medicines taken were unsuccessful.  Tr. 199.  On October 4, 2002, Timothy Gray, DO evaluated Farmer for chronic hiccups.  Tr. 197-98.  Farmer explained that she had been suffering with hiccups for 18 months, that the hiccups got worse when she was agitated and that resting quietly helped mildly.  Tr. 198.  Dr. Gray prescribed Baclofen (5 mg) and later had Farmer undergo a CT scan of the neck and chest.  Tr. 197. Dr. Hero reviewed Dr. Gray's notes and agreed with Dr. Gray's assessment.  *Id.*  On October 10, 2002, an unnamed doctor wrote on a progress note that Farmer was "alert, hiccuping" and that in connection with belching, Farmer would be undergoing a CT scan that day to rule out mass. Tr. 196.  After a consultation on December 4, 2002, Dr. Gray noted the following:

> Along with Maybelline's history of hiccups which she had for 18 months until we started her on baclofen in October, she noticed there has been an increased hoarseness of her voice.  She says that her friends can tell that her voice is more hoarse and it has been getting worse *after the hiccups have stopped*.

Tr. 193 (emphasis added).

---

[7]  Although there is a discrepancy between Dr. Hero's and Farmer's statements about the onset date of the chronic hiccups, neither party has raised this issue.  Thus, the court will not address it.

13 - FINDINGS AND RECOMMENDATION

The neck and chest CT scan showed no masses and no adenopathy.[8]  *Id.*  As a result of the CT scan, Dr. Gray decided to refer Farmer to Dr. Robert Roberts, an ear, nose and throat specialist, for evaluation of the hoarseness and laryngoscopy "in an attempt to have even further cord visualization."  *Id.*  Dr. Gray noted:  "[i]f all of this is clear I will feel better about the patient's presentation of chronic hiccups."  *Id.*  He also continued prescribing Baclofen, assessed that Farmer suffered from GERD esophagitis, noted she has a history of "chronic esophagitis" and sent her to Dr. Tim Burke for upper endoscopy in connection with her GERD esophagitis. *Id.*  He continued to prescribe Protonix for GERD, hoped to receive the record of an upper endoscopy Farmer had undergone in 1997, and believed that "GERD may be the cause of her cough as it is when she is lying down, and it also may be part of her hoarseness."  *Id.*  Dr. Hero reviewed and agreed with that assessment.  *Id.*  No medical records containing Dr. Roberts's and Dr. Burke's assessments have been provided.

On December 18, 2002, Farmer told an unnamed doctor at Family Care Services that the hiccuping continues "off and on," that Baclofen worked for about two months and that she is awake at night.  Tr. 192.  She was diagnosed with acute hiccups, prescribed a higher dose of Baclofen to help control the spasms, and given a complete referral to Dr. Roberts.  *Id.*  On January 31, 2003, Dr. Hero noted hiccups on the medical record, but the context is unknown as the notes are illegible.  Tr. 190.  That is the last medical note in the record before Dr. Hero completed the check-the-box form on April 16, 2003.

In summary, the record contains evidence of a medically documented disturbance of movement and its control.  While Dr. Hero opined on the check-the-box form that Farmer's

---

[8]  Adenopathy is the swelling or morbid enlargement of the lymph nodes. STEDMANS MEDICAL DICTIONARY (27th ed. 2000).

hiccups had a non-organic cause, the record neither supports nor contradicts this conclusion. There is evidence that doctors ruled out other possible causes of the hiccups and belching, namely a mass or adenopathy. There is also evidence that doctors sent Farmer to specialists for further tests in an attempt to pinpoint the cause of the hiccups, but the specialists' assessments are missing from the record.

### b.    Medical Documentation of Marked Difficulties

With respect to part B of the Listing for Somatoform Disorders, Dr. Hero concluded that Farmer suffered from "marked difficulties in maintaining social functioning" and "marked difficulties in maintaining concentration, persistence, or pace." Tr. 212. "Marked" is a standard for measuring the degree of limitation that is more than moderate but less than extreme. 20 CFR Pt. 404, Subpt. P, App. 1, 12.00.C. A review of the record reveals little medical evidence to support this assessment.

Elizabeth Kirkhart, Ph D, conducted a psychological assessment of Farmer after examining her on April 11 and April 25, 2002. Tr. 148-55. Dr. Kirkhart diagnosed Farmer with "major depressive disorder, recurrent, severe," gave her a prognosis of "poor to guarded," believed Farmer had been depressed since early childhood without treatment, and estimated the symptoms would last well over a year. Tr. 152. She rated Farmer's Global Assessment of Function ("GAF") at 51. *Id*.[9] A rating of 51-60 on the GAF scale indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or

---

[9] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." DSM IV, p. 32. It is essentially a scale of 0 to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations. *Id* at 34.

co-workers).”  American Psychiatric Ass’n., Diagnostic and Statistical Manual of Mental

Disorders, p. 34 (4th ed. 2000) (“DSM IV”).  Farmer looked “sad, depressed and anxious.”

Tr. 151.  On the Minnesota Multiphasic Personality Inventory test (“MMPI-2”),[10] Dr. Kirkhart

stated that individuals with Farmer’s profile tend to have “[i]nterpersonal difficulties” which

“can include discomfort with heterosexual relationships and feelings of social inadequacy.

Social involvement is generally avoided.  These people are shy and more comfortable alone or in

small groups.”  Tr. 155.

    Dr. Kirkhart found Farmer to be oriented to the person, time and place, to exhibit sound

judgment and insight into her problems, and concluded Farmer “is capable of making decisions

involving her affairs.”  Tr. 151.  According to the Weschler Adult Intelligence Scale-III

(“WAIS-III”), Farmer has a low average IQ of 88.  *Id.*  Dr. Kirkhart found Farmer’s memory to

be intact for remote events.  *Id.*  While Farmer reported to Dr. Kirkhart that her short-term

memory had been terrible lately, Farmer’s working memory test score was not significantly

lower than her other test scores.  *Id.*  Dr. Kirkhart did opine that Farmer’s “current memory

difficulties may be related to the stress and depression she is currently experiencing.”  *Id.*

However, no test result supported Farmer’s subjective symptom of recent short-term memory

problems.

    For treatment, Dr. Kirkhart recommended psychotropic medications, long-term

individual psychotherapy to help Farmer develop insight into her condition, and “[a]ttending

classes at a community college *to prepare for employment* and to increase her self-esteem and

---

[10]   The MMPI is a questionnaire type of psychological test for ages 16 and over, with 550 true-false statements coded in 4 validity and 10 personality scales.  Stedman’s Medical Dictionary (27th ed. 2000), p. 1805.  The validity scales measure “the individual’s test-taking aptitude and degree of frankness.”  Blakiston’s Gould Medical Dictionary (3d ed. 1972), cited by *Kearney v. Standard Ins. Co.*, 175 F3d 1084, 1092 n3 (9th Cir 1999).

self-confidence." Tr. 152 (emphasis added). While Dr. Kirkhart's medical opinion contains no discussion of any functional limitations, the ALJ's inference that Dr. Kirkhart did not believe Farmer's depression prevented her from being able to work appears to be reasonable.

Dr. Morell examined Farmer on July 18, 2002 in connection with her neck, shoulder, back and heel pain. Tr. 156-60. He discussed Farmer's functional limitations, finding that any limitations related to her feet, left shoulder, and lower back are "mild." Tr. 160. He concluded that "her function is primarily limited by the neck pain secondary to two herniated discs in her neck," but did not discuss to what extent. *Id.* Although Dr. Morell noted a history of chronic hiccups and burping, he did not address any functional limitations they may cause. Tr. 157.

Disability Determination Services ("DDS") doctors conducted a Psychiatric Review Technique of Farmer signed on August 6, 2002, half a year before Dr. Hero's check-the-box opinion. Tr. 161-74. They concluded that she suffered from "MDD," a medically determinable impairment that does not precisely satisfy the diagnostic criteria of Listing 12.04 for affective disorders. Tr. 164. They also rated Farmer's functional limitations as mild restriction of activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, with insufficient evidence of episodes of decompensation. Tr. 171.

The medications Farmer was prescribed by Family Care Services include, among others, anti-depressants, sleeping pills and anti-seizure medication (Prozac, Valium, Celexa, Baclofen, Neurontin, Trazodone and Sonata). Tr. 207-08. Farmer was prescribed treatment against insomnia on October 1, 2001 (Tr. 135) and requested a refill of the medication on March 28, 2002. Tr. 134. During several medical examinations, Farmer was observed to be tearful. Tr. 136, 150-51, 191.

17 - FINDINGS AND RECOMMENDATION

To summarize, the record contains medical evidence to support Dr. Hero's opinion that Farmer suffers from *some* difficulties in maintaining social functioning.  Farmer's GAF score of 51 suggests "moderate" symptoms or "moderate" difficulty in social, occupational, or school functioning.[11]  Her MMPI-2 profile is that of a person who has difficulty with social involvement.  In addition to the medical evidence, the record contains Farmer's own statements describing the hiccups, a recording of the administrative hearing,[12] as well as the ALJ's own account of the hiccups: "She presented at the hearing with some hiccoughing and burping, which was not well controlled during questioning by the undersigned.  But she was substantially better when her representative asked her questions."  Tr. 26.

However, other than Dr. Hero's conclusory opinion, no medical evidence supports an assertion that Farmer's chronic hiccups and belching causes "marked" difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.

### c.    The ALJ's Duty to Develop the Record

After reviewing Farmer's medical file, this court finds the record is incomplete as to the cause of Farmer's chronic hiccups and belching, as well as to the effect these disruptions of movement and its control have on her functional abilities.  It is unclear how Dr. Hero arrived at the conclusion that Farmer's chronic hiccups and belching have a non-organic cause or that they cause marked difficulties in maintaining social functioning and in concentration, persistence or pace.

---

[11] A lower GAF (between 41 and 50) suggests serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)."  DSM IV, p. 32.

[12] Farmer alleges that during the approximately 43-minute administrative hearing, she had "142 belches (longer spasms) and 81 hiccoughs (shorter spasms), all of which are audible on the hearing tape."  Farmer's Reply Brief, p. 8.

The Commissioner is required to "make every reasonable effort to recontact [treating] sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to [the Commissioner.]"  SSR 96-5P, 1996 WL 374183, *2; *see also* 20 CFR §§ 404.512(e) & 416.912(e) (outlining the Commissioner's responsibility to recontact treating physicians or psychologists when the evidence is inadequate for a determination of disability).  As the ALJ indicated, the basis for Dr. Hero's opinion is not clear from the record.  As a result, the ALJ was required to make a reasonable effort to recontact Dr. Hero for clarification of the basis for her opinion.  Nothing in the record indicates the ALJ did so.

### 3.    No Other Somatoform Disorder Diagnosis

Another reason offered by the ALJ for rejecting Dr. Hero's opinion was the absence of other diagnoses of somatoform disorder in the record.  This is not a clear and convincing reason for rejecting a treating doctor's opinion, as there is no requirement of the same diagnosis by multiple doctors.   Moreover, while the record contains no other diagnoses of somatoform disorder, it is also void of any medical opinions by treating or examining physicians contradicting Dr. Hero's somatoform disorder diagnosis.

### 4.    Whether the Hiccups are Disabling

Last, but not least, the ALJ refused to give weight to Dr. Hero's opinion because no other source has found Farmer's hiccups to be disabling.  Although the ALJ was correct that no other source found the hiccups to be disabling, he had a duty to seek a clarification from Dr. Hero concerning her diagnosis and the specific functional limitations it imposes, as discussed above.

### 5.    Conclusion

19 - FINDINGS AND RECOMMENDATION

The ALJ's justifications for rejecting Dr. Hero's opinion are not clear and convincing. This court finds that remanding the case of the ALJ to develop the record as required by SSR 96-5 is necessary in order to make an informed decision on the issue of Farmer's disability. Because further administrative proceedings are necessary to resolve outstanding issues before a disability determination can be made, an immediate award of benefits is not appropriate.

**II.    <u>Failure to Obtain an Updated Medical Opinion</u>**

Farmer argues that the ALJ failed to obtain an updated medical opinion from a state medical expert upon receiving Dr. Hero's check-the-box form.  In support of her contention, Farmer relies on SSR 96-6P, 1996 WL 374180, which covers the consideration of administrative findings of fact by state agency medical and psychological consultants and other program physicians and psychologists.

The DDS doctors conducted a Psychiatric Review Technique of Farmer signed on August 6, 2002.  Tr. 161.  Farmer offered Dr. Hero's check-the-box opinion into evidence on the day of the administrative hearing, April 17, 2003.  Tr. 237.  Farmer believes that the ALJ should have obtained a new medical opinion from DDS upon receipt of the additional evidence as the DDS doctors did not have a chance to consider a diagnosis of somatoform disorder for Farmer. The Commissioner responds that because the new evidence from Dr. Hero did not change the ALJ's mind with regard to the listings, he was not required to solicit any additional state medical expert opinion under SSR 96-6P.

Under SSR 96-6P, an ALJ must obtain an updated medical opinion from a medical expert "when additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of

20 - FINDINGS AND RECOMMENDATION

Impairments." *Id* at *4.  However, the ALJ's opinion that Dr. Hero's diagnosis would not change the state agency's psychological findings was based on an incomplete report, one that he had a duty to further develop under SSR 96-5P, as discussed above.

### III.   Credibility Finding

#### A.   Legal Standard

Farmer alleges the ALJ did not offer sufficient reasons for disregarding her testimony. When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must:  (a) "produce objective medical evidence of an impairment or impairments"; and (b) "show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom."  *Smolen v. Chater*, 80 F3d 1273, 1282 (9th Cir 1996) (citations omitted, emphasis in the original).  The claimant is only required to produce objective medical evidence of the impairment, not of the symptom itself, the severity of the symptom or the causal relationship between the impairment and the symptom.  *Id*.  The claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused *some* degree of the symptom.  *Id* (emphasis added).

In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  To determine whether subjective testimony is credible, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek

treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Id* at 1284 (citations omitted).

The following factors must also be considered:  the circumstances under which the claimant testified, any contradictions or corroborations, the claimant's prior work record, the nature of any symptoms and medical treatment, her daily activities, and any other factors concerning the claimant's functional limitations and restrictions.  20 CFR § 404.1529; SSR 96-7p, 1996 WL 374186, *3.  In weighing evidence of pain, the ALJ is also required to consider the "nature, location, onset, duration, frequency, radiation, and intensity of any pain," "precipitating and aggravating factors such as movement, activity, environmental conditions," "type, dosage effectiveness, and adverse side-effects of any pain medication," "treatment, other than medication, for relief of pain," "functional restrictions" and "the claimant's daily activities." SSR 88-13, 1988 WL 236011, *3-4.

"[O]nce a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain."  *Bunnell v. Sullivan*, 947 F2d 341, 345 (9th Cir 1991) (*en banc*) (citation omitted).  "While subjective pain testimony cannot be rejected on the sole ground that it is not corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and *its disabling effects*."  *Rollins v. Massanari*, 261 F3d 853, 857 (9th Cir 2001), citing 20 CFR § 404.1529(c)(2) (emphasis added).

If the ALJ finds the claimant's symptom testimony is not credible, the ALJ '"must specifically make findings which support this conclusion" and the findings "must be sufficiently

specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit" it. *Bunnell*, 947 F2d at 345 (internal quotations and citations omitted). If there is no evidence of malingering, the ALJ may reject symptom evidence only if he gives clear and convincing reasons, including which testimony is not credible and what facts in the record lead to that conclusion. *Smolen*, 80 F3d at 1281.

### B.    Farmer's Testimony

Farmer testified that she is not currently working because of the pain in her neck and the hiccups. Tr. 245-46.

### 1.    Neck Pain

She explained she suffers from neck and lower back pain, as well as sharp pain that shoots through her left leg, and that the pain is severe about half the month. Tr. 241-42. The neck pain is constant and ranges from mild to severe; when it is severe, her shoulder also has severe pain. Tr. 244-45. Her pain is severe the majority of the time unless she is on medication. Tr. 245. The neck pain prevents her from turning her head so she cannot put her arm into clothing, cannot put on her shoes unless they slide on, and cannot bend and touch below her knees. Tr. 242. She can sit for 20 minutes before she notices she has pain in her tailbone, and can stand for 20 minutes, so she rotates. Tr. 242-43. She mostly has to lay to one side with a neck brace. Tr. 243. She has walking problems, feeling a sharp pain like a needle in her back and her pelvic bone in the lower back up on the left side. *Id.* She cannot lift a 10-pound weight for two thirds of an 8-hour workday because of her left shoulder pain and inability to bend and use her neck to pick it up. Tr. 243-44. She can pick up a 10-pound weight for one third of an eight hour day if she does not have to bend down to pick it up. Tr. 244.

### 2.    Hiccups

23 - FINDINGS AND RECOMMENDATION

Farmer testified that she had been suffering from hiccups for the past two years.  Tr. 249.

At first she only had spells that lasted for a month to a few months, but now she suffers from

hiccups every day.   Tr. 246-47, 249.  She takes medication for hiccups which helps, and her

hiccups at the time of the administrative hearing were mild.  Tr. 246-47.  She saw two doctors

for her hiccups, Drs. Kenilworth[13] and Hero, who performed tests but were not able to determine

the cause of the hiccups.  Tr. 247-49.

When asked about the effect of hiccups, Farmer explained that hiccups affect her

concentration because "[i]t's hard to concentrate on stuff when you are hiccuping which causes

other pains because constant hiccups cause me chest pains and stomach pains and make  you feel

like you're hurting so my mind goes from one thing to another and I think that's why I forget

some things I'm not sure."  Tr. 256.  Hiccups also cause her embarrassment being around other

people, as they think she is rude or there is something wrong with her, and she just wants to "go

over there and stand in a corner."  *Id.*

///

///

### 3.    Depression and Anxiety

Farmer stated that she has suffered from depression and anxiety since the year 2000,

experiencing symptoms of "[s]leeplessness, headaches, sweats, days of just not being there."

Tr. 250.  From July 2000 to February 2001 she took care of her brother-in-law, who was dying

from cancer.  Tr. 238.  She changed his diaper, fed him, gave him his medication, all without

pay.  *Id.*  She struggled with the task both physically and emotionally.  Tr. 249.  She could not

---

[13]  The record contains no other reference to Dr. Kenilworth.

24 - FINDINGS AND RECOMMENDATION

move him by herself because of the pain and shoulder pain, so she could not lift him to help him

to the bathroom. *Id.* She also found it hard to deal with the emotional aspects, and could not

sleep, eat or get the situation out of her mind. *Id.* She became withdrawn and "started not to

communicate with other people." Tr. 240. After her brother-in-law passed away, she did not

return to work because she found it hard to leave the house, could not get up and "there were

days I wouldn't do anything." *Id.* Other days she experienced a swollen neck resulting in

limited movement. *Id.* During "down days," which can last up to two or three days in a row, she

feels like "being in a black hole that you can't get out of." Tr. 251. She went to see a

psychiatrist twice in August 2002 and also talks to a counselor. Tr. 250.

### 4.    Daily Activities

Farmer lives in an apartment with her 20 year old daughter who shares the cooking

duties. Tr. 251. When Farmer has a "down day," she prepares something quick, but does

nothing else; she does not clean or leave the apartment. Tr. 251. She mops and vacuums, but

not every day, and does all the grocery shopping. *Id.* She no longer drives and her oldest

daughter takes her to the store. Tr. 251-52. Farmer provides the primary care for her live-in

younger daughter who has a mental disability, although her daughter can take a bus by herself to

get to her medical appointments. Tr. 252. Farmer reads Bibles and religious magazines, watches

TV sometimes, and helps and supervises her daughter. Tr. 252-54. She cannot read for long

periods of time because she gets headaches and has problems remembering what she has read.

Tr. 254. She goes to church, but not every Sunday because she doesn't "feel up to it" and does

not know why. Tr. 254. The people from church come by to see whether she is okay, but she

does not socialize with them otherwise and she does not know why. Tr. 255.

### C.    Analysis

25 - FINDINGS AND RECOMMENDATION

The ALJ found Farmer's statements concerning her impairments and their impact on her ability to work are "not entirely credible in light of information in the medical reports and elsewhere in the record." Tr. 23. Farmer's statements, even if credited as true, would not resolve all outstanding issues or compel a determination of disability. Without further vocational evidence, it remains unclear whether the combination of limitations she described would preclude all work.

The VE was given the following hypothetical: a person with 13 years of education who can occasionally lift up to 20 pounds, can frequently lift 10 pounds, can sit, stand and walk six plus six hours with an option to alternate at the will of the employee, can push and pull within the weight limits above with the lower extremities, and on an occasional basis with the upper extremities, who will have limited reaching with the left upper extremity, who has a moderately limited ability to understand, remember and carry out detailed instructions and a moderately limited ability to interact appropriately with the general public. Tr. 258-59. The VE responded that such a person could perform certain jobs, including general office clerk, file clerk and copy machine operator. Tr. 259-60. He believed the burping and hiccuping would not interfere with any of these jobs, although he admitted to have never observed a person with that problem in the workforce or studied how someone with this condition is affected in the workforce. Tr. 260-61.

When asked to incorporate everything from the first hypothetical and to also consider someone who suffered a marked deficiency in concentration, persistence and pace that impeded or stopped production for up to one third of the day, the VE concluded that would eliminate all jobs. Tr. 261. Another hypothetical added "someone who becomes easily embarrassed due to their condition of chronic hiccups and therefore impedes their production up to one-third of the

day due to their embarrassment and not being able to do their job." Tr. 262-63. The VE responded that person would not be able to sustain employment. Tr. 264.

The last two hypothetical questions, although favorable to Farmer, are not based on supported evidence in the record. As explained above, although Dr. Hero concluded Farmer suffers from marked deficiencies in concentration, persistence and pace, a remand is necessary to develop the record and learn the basis for Dr. Hero's opinion. Moreover, a hypothetical based on a person who becomes embarrassed due to their condition of chronic hiccups, which impedes production at work for up to one third of the day, is not supported by Farmer's testimony.

The ALJ found Farmer not credible in light of the medical evidence (as well as other evidence in the record). Due to the need for a remand concerning Dr. Hero's opinion, the ALJ's credibility determination should also be reevaluated upon remand to include the additional medical evidence.

## IV.    Severity of Farmer's Chronic Hiccups/Belching

The "severity inquiry permits the Secretary to identify efficiently those claimants whose impairments are so slight that they are unlikely to be found disabled even if the individual's age, education, and experience are considered." *Corrao v. Shalala*, 20 F3d 943, 949 (9th Cir 1994) (citations omitted). Pursuant to the Commissioner's interpretive guidelines, an impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at step two when the evidence establishes "only a slight abnormality or combination of slight abnormalities" which have "no more than a minimal effect on . . . his or her physical or mental ability(ies) to perform basic work activities." SSR 85-28, 1985 WL 56856, *3 (1985); *Yuckert v. Bowen*, 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28).

27 - FINDINGS AND RECOMMENDATION

The Social Security Regulations give the following guidance regarding determining whether an impairment is severe:

> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include–
>> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>> (2) Capacities for seeing, hearing, and speaking;
>> (3) Understanding, carrying out, and remembering simple instructions;
>> (4) Use of judgment;
>> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>> (6) Dealing with changes in a routine work setting.

20 CFR §§ 404.1521, 416.921.

A claimant must prove the physical or mental impairment by providing medical evidence consisting of signs, symptoms and laboratory findings; the claimant's statement of symptoms alone will not suffice. *See* 20 CFR §§ 404.1508, 416.908. "[S]ymptoms . . . are an individual's own perception or description of the impact of his or her physical or mental impairment(s) . . . [W]hen any of these manifestations is an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom.'" SSR 96-4p, 1996 WL 374187, *1 n2, cited by *Ukulov v. Barnhart*, 420 F3d 1002, 1005 (9th Cir 2005). A determination of the severity of an impairment requires the ALJ to evaluate the medical findings describing the effects on the claimant's physical and mental ability to perform basic work activities. SSR 85-28, 1985 WL 56856, *4.

28 - FINDINGS AND RECOMMENDATION

Because the analysis depends on the effect of the impairment on Farmer's physical or mental abilities to perform basic work activities, it could potentially change as the ALJ develops the record on remand.  Moreover, the analysis partially depends on the ALJ's findings regarding Farmer's credibility, which may also change depending on the additional medical evidence obtained on remand.  It is therefore premature to decide this issue.

**V.**    **The VE's Testimony**

Farmer alleges that the ALJ asked a defective vocational hypothetical question because it did not address the limitations that Farmer's hiccups and belching would cause with co-workers, and only addressed the limitations as related to interaction with the public.  Because the ALJ's vocational hypothetical is based on Farmer's limitations in the record, which should be further developed on remand, it is not necessary to decide this issue at this time.

///

///

///

///

///

**RECOMMENDATION**

Based on the foregoing, the case should be REMANDED to the Commissioner pursuant to Sentence Four of 42 USC § 405(g) for further proceedings in accordance with this Findings and Recommendation.

**SCHEDULING ORDER**

29 - FINDINGS AND RECOMMENDATION

Objections to the Findings and Recommendation, if any, are due by April 17, 2006. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 28th day of March, 2006.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

30 - FINDINGS AND RECOMMENDATION